East'n District.
*March*, 1823.

BERNARD
*vs.*
VIGNAUD.

for such debts either as third possessors or sureties.

BERNARD & AL. vs. VIGNAUD.

*Livingston*, on application for a rehearing. It is with the utmost reluctance that the defendant's counsel forces himself on the attention of the court once more in this cause. A perusal of the judgment, however, convinces him that the verbal arguments he urged on the hearing, were so ill expressed as not to be understood at the time, or so feebly stated, as to have escaped the attention of the court during the long interval between the argument and the decision.

East'n District.
*March,* 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

The court say that the defendant contended that Fouque was not " tutor either *de jure* or *de facto.* " This statement convinces me, my argument was misunderstood; because it implies an admission that if he had been tutor *de facto* he would have been liable. Whereas the foundation of my whole argument on this point was, that there could be no such thing as a tutor *de facto,* as opposed to one *de jure,* that he must either be tutor *de jure,* or a mere intermeddler in the affairs of the minor.

The argument I pressed was this. The law gives the tacit mortgage on this subject in *two* cases *only.*

1st. On the property of the tutor. *Civil Code,* 72--75.

2d. On the property of him who "*without being tutor*" takes upon himself the administration of the property of the minors *Civil Code,* 456, art. 20.

The court cannot extend it. There is no reason for doing it if they could; the law gives no lien on the property of those who deal with the tutor, or who borrow the minor's money from him.

Was Fouque *tutor?* this was my first enquiry, not did he act as such? not did he take the

East'n District.
March, 1823.

BERNARD&AL.
vs.
VIGNAUD.

title? not even did he accept the trust? none of these acts give the lien. He must be *tutor* to come within the first provisions of page, 72, 75.

If he was not *tutor* than he must have administered, to bring him within the provision of the *Code* 456, art. 20.

The court in their opinion clearly lose sight of this distinction for they say. " By the opi- " nion heretofore rendered in this case, it was " determined, that Fouque did assume and take " upon himself the tutorship as set forth by " the plaintiff." But because a man named as tutor by the testator, takes upon himself the tutorship, is he therefore a tutor? no more it appears to me than a man would be sheriff who on being named by the Governor should act without being confirmed by the senate and without taking the oath or giving security.

The office of tutor is as much created by law as that of sheriff. The father or mother have no natural right to make the appointment any more than the Governor has a natural right to make a sheriff; both powers are given by positive law, in both cases all the formalities required by law must be complied with before the act is complete. The father or surviving mother may appoint a *tutor* that is,

they may name one, but something more is re- East'n District.
*March,* 1823.
quisite besides this nomination and the tutors
acceptance.   The judge must confirm this BERNARD&AL.
*vs.*
VIGNAUD.
appointment, *art.* 14 *p.* 60 ; *art.* 15, he may on a
refusal to confirm appoint another, *art.* 22
speaks again of his right of *confirmation*, where
there is a previous *nomination*; or of *appoint-
ment*, where there has been none; and gives a
right of *appeal* to this court from his decision.
But this is not all, *art.* 53 " prior to the entering
" on the exercise of their duties" they shall
*take an oath* faithfully to fulfil them, and *art.* 55
he shall give security to the Judge who " ap-
" pointed or *confirmed* him".

This is the will of the law by which alone
the officeof testamentary tutor is created; he
must be named by the father or mother, must *
accept, be confirmed by the Judge, must take
the oath of office, and give security; until all
these five requisites concur, the law has not
been complied with, which makes him tutor.
Here there have been only two of the five he
has been named by the testator and (the court
think) he has accepted; but would not the
court I respectfully ask, alter the law if they
should say (which they have not yet done)
that two (out of five requisites) being complied

BERNARD&AL.
*vs.*
VIGNAUD.

with, he was therefore *tutor?* if they can dispense with the three last requisites why not with the two first? what bounds would there be to such constructions?

To test this strictly, suppose an application made for a *quo warranto* against a Parish Judge who had omitted only the taking the oath, and giving security, although he might have been confirmed by the senate and commissioned, and he was to answer that he was Judge. Can there be a doubt that the determination would be against him, but how much stronger would the case be if he had never been confirmed or commissioned. Can there be any difference because this is a *private office?* surely the reason is the same. If he *is tutor* without taking the oath, without being confirmed, without giving security, then he need never perform these formalities, then he may administer without those safeguards for the correctness of his administration, then no tutor would ever give this security, then the law would be a dead letter which prescribes it. Suppose Fouque had brought a suit as tutor and the defendant was to answer by denying that he was tutor, could judgment be given for him merely by his producing the evidence of the

will and the inventory? if not. then surely this branch of the enquiry is decided, and we must say that he was not *tutor*.

East'n District.
*March*, 1823.

BERNARD&AL.
*vs*
VIGNAUD.

I entreat the court to remember that our first enquiry is strictly, was he *tutor?* Not whether he acted as such, or called himself so, or thought that he was, but was he so *really?* If he was not, then he cannot come within the purvieu of the 75th article, and we have disposed of the one-half of our enquiry.

I am the more earnest on this point because neither in the first, nor the second judgment of the court is this question decided. If the court say that he was *tutor*, although never confirmed, and without the security and the oaths, then I should think myself presumptuous in saying any thing more on the subject, but until that is done the consequence of the cause to my client and the extensive results of such a decision upon the principles of our jurisprudence make me deem it a duty to ask the decision of the court upon it.

In the first decision of this cause, 10 *Mart.* 483, the principal attention of the court seems to have been drawn to the question, whether Fouque had accepted the tutorship? and deciding that he had, they determine that the

East'n District. tacit mortgage attached—it is true, they say,
*March*, 1823. page 485, that the want of the oath, and of
BERNARD&AL. the security (leaving the want of *confirmation*
vs. wholly out of view) " are circumstances which
VIGNAUD. cannot alter the nature or extent of his liabi-
lity." But what I ask the court most respect-
fully to determine, is, not whether these
omissions alter his liability, (I well know, that
if he has *administered*, these omissions would,
certainly not lessen it,) but, whether he is *tutor*
without having complied with those formali-
ties, and without being confirmed ? I regret
exceedingly, that, that part of my petition for
a re-hearing, which went to the merits of the
case, has been mislaid by the judge; it contain-
ed some arguments and authorities, of which
I have kept no note, and to which I should
now be glad to refer, having no time to look
again for the authorities—only that part is
printed, which relates to the admissibility of
Fouque as a witness. Before I quit this first
enquiry, permit me also to remark that I think
the analogy endeavoured to be established in
the first decision of the court, (10 *Martin*, 483)
between the tacit acceptance of a tutorship
and of a succession is not well founded.

It is based on the maxim *ubi eadem est ratio*,

*eadem est lex*—but nothing it appears to me can be more dangerous than such a maxim, if applied to different branches of our statutory jurisprudence; the court in such case would have by means of this maxim, the complete controul of all the written laws. The provisions of one statute, would always be extended to another, although the Legislature by their omitting them, had as clearly signified their will as they could have done by express words,—and surely nothing can exemplify this more strongly than the present case : the Legislature have declared that when the *heir* assumes that quality in any instrument or judicial proceeding. he shall be deemed to have accepted the succession; no oath, no confirmation, nothing more is prescribed. With respect to a tutor the Legislature have declared, that he must be named, be confirmed, take the oath of office, and give security. Now if the court think that there is no more reason for these formalities in the case of a tutor, then in the case of an heir, in other words that *eadem est ratio*, the consequence follows *eadem est lex*, and the whole form, nay, the very essence of the statute is changed— it is as completely repealed as if the legisla-

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

BERNARD&AL.
vs.
VIGNAUD.

ture had done it: for as the courts must execute the legislative will, if they adopt a maxim which authorises, nay, which obliges, them, to put such a construction on the laws, as to make them all come within the same rule of reason, as their rule may be different from that adopted by the legislature, and as there can be but one true rule of reason, they must adopt that which is the true one, and whenever it conflicts with that of the Legislature, the latter must give way. But in this case, if even the maxim should be adopted as our rule, it will be proper to inquire whether the reason why the slight evidence which is sufficient to show the acceptance of a succession, should also be enough to charge a tutor with all the burthens of his trust.

The *ratio quare* appears to be widely different: the one, is an act which holds out great inducements for the party to perform. but by which he may also incur responsibilities—the law therefore will not permit him to play fast and loose; to declare one day that he is heir, to act as such, perhaps get the succession by those means, and then by denying that quality, to avoid the payment of the debts of the estate. This is the reason why they make

the first act of assumption obligatory on him. East'n District.
March, 1823.

BERNARD&AL.
vs.
GIGNAUD. The quality of heir also is not a trust, not an office. The person upon whom it is cast is at perfect liberty without consulting a magistrate, or finding security, or giving any pledge, to take the quality, it depends entirely on his own volition, every act therefore, that evidences that will, is sufficient to make him heir : and the legislature has for greater certainty designated what acts shall be legal evidence of it.

But the case of a tutor is widely different; it is a trust, an office, a private one indeed, but still an office; created by law, and the admisson to which is regulated by forms prescribed by law. It does not solely depend upon the will of the person who is named by the testator to be tutor, as it does on that of the person whom he has instituted his heir, to determine whether he will be so or not; the judge must be consulted, his securities must be approved, he must take the oath and receive his commission, or his confirmation, which is equivalent to it.

The acceptance therefore makes the heir; but the acceptance alone does not make the tutor. The reasons of the provisions which

govern the one case, are not the same with those which govern the other.

Having offered my reasons to show that Fouque in this case was never the tutor of the plaintiff, if they are satisfactory, I have only to show:

II. That Fouque never took upon himself the administration of the property of the minors.

The object of these two articles of our code was evidently to carry into effect the provisions of the ancient law for the security of minors against the acts of those, who either with or without authority, should administer their estate. They go to the full extent of those laws, but they go no further. They make the tutor liable for omission as well as mal-administration. But they make the intermeddler liable only for the losses occasioned by his administration. For this doctrine I refer the court to the authorities, (and they were very numerous) which I cited on the hearing. If, for instance, one without being tutor should administer as such, but faithfully administer, and that a legal tutor should afterwards be appointed, by whom the estate of the minor should be defrauded, surely then

the unauthorised administrator could not be made liable for these losses.

East'n District.
*March*, 1323.

BERNARD&AL.
*vs.*
VIGNAUD.

The second enquiry then after determining that Fouque was not tutor, would be, has he " taken upon himself the administration of the plaintiffs' property ?" if he has, have they suffered any loss in consequence of it ?

If from any thing that appears in this cause, these facts can be fairly inferred, then I give up this point of the defence of my unfortunate client. To resolve the first of these questions we must have a distinct idea of the terms that are used, what it is to take upon oneself the administration of a minor's property.

Our code tells us that words are to be understood in their " most known," " usual," " general," and " popular" signification—with this guide I should say that there can be no administration of an estate without some act in relation to it, such as none but an owner or one authorized by him could legally do. To pick up an article of personal property that had been lost belonging to a minor, and carry it to his guardian—to borrow the same article and return it ; to make a list of property to be delivered to the executor, none of these are acts of administration, because none of

them imply ownership or authority. If my definition be a true one, (and I am really at a loss how the word can be employed in any other sense,) we are prepared to determine how far Fouque had taken upon himself the administration of the plaintiffs' property, by any of the acts he had done.

What are those acts? it will not take us long to enumerate them. He assisted at the taking an inventory preparatory to the executors taking possession of the property; in the caption to which inventory, which probably he never read, he is styled tutor, immediately after which the executor (who was also named tutor) takes the whole and exclusive possession of the property, in conformity with the directions of the will by which the *seizen* is given to him alone. How then is it possible that Fouque could at this time, and by this act, be said to administer, when the very act was, to give formality and notoriety to the sole administration of another? Nothing was done here that by the most forced construction could be supposed to imply an act of authority or disposition, of the property by Fouque, consequently there was no administration.

East'n. District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

The next and the only other act relied on, is the borrowing the money—but it is difficult to conceive any act, that so completely excludes the idea of administration as this does. The administrator is he who lends, certainly not he who borrows; if every man who borrowed money of a minor's estate were to be considered in that light, there would be no end to the tacit mortgages it would produce, and it would soon effectually put a stop to any species of dealing with a tutor; for as no kind of dealing can be more remote than this, from the idea of an administration, every other kind would of course incur the responsibilities and inconveniencies attached to it.

It will surely not be objected that although neither of these acts alone would amount to an administration, yet that being accompanied in the two instruments by which they were effected, with an assumption of the quality of tutor, that this changes their nature. I say this will not occur to the court, as an objection to my argument, because we are not enquiring now whether Fouque took upon himself the quality of tutor, or what effect that assumption would produce; we are only inquiring whether he administered—and to say

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

that he administered because he was tutor, and that he was tutor, because he called himself so, would seem to be revolving in a circle which we could never quit, and carrying us back to the first branch of our inquiry, which if we wish to reason distinctly, should not be confounded with the second. The law has designated two cases in which the tacit mortgage attaches, and only two. First, when the party is tutor. Secondly, when he administers the property without being tutor. If the court say that it shall attach in all cases where he calls himself tutor, it appears evident to me that they add a third case to the two which the law has thought sufficient for the security of the minor, and if they go on to say that whoever acts as tutor, though he does not administer, the property shall also be liable, they add a fourth case; for there are acts which none but a tutor can lawfully do, which are not acts administrative of the minor's property. The making of an inventory of property in possession of another, as in the present case, the directing of his education, the care of his morals, the selection of his masters, the consent to his marriage, and others of this nature, have no relation to his

property, and therefore certainly can never come within the letter nor the spirit of the law, which attaches the lien on those " who without being tutors, take upon themselves the administration of the property of the minor." I hope the court will excuse me for requesting them once more to remark that it is not administration alone, but administration of the property that causes the lien,—and that therefore I am right when I say a man may act as tutor and incur no responsibility if he is not tutor, and does not administer the property.

The legislature has by a series of late acts shown the utmost solicitude to reduce the number of these tacit liens, which render purchases insecure, and sometimes cause the ruin of the most cautious dealers. If the court had the power to extend them, they would it seems to me, pause before they did it; but in a case where the legislative will is so clearly expressed, and has confined the lien to two cases—they will do more than pause, they will stop, and not add a third or fourth case, as I think has been demonstrated they must do, if they give the lien and do not explicitly

East'n District.
*March,* 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

declare either that Fouque was tutor, or that without being so, he had administered the property. They have not yet said so, when they do so I shall respectfully submit and lament that interest for my client should so far have clouded my faculties, as to have prevented my perceiving the true application of the law to my case. One word more on the subject of the loan made by the executor to Fouque, considered as an act of administration in the latter. I have said that no act could more effectually exclude the idea of administration than borrowing, because it showed most explicitly that the exclusive management and direction was in another. Let me add the circumstances that appeared in evidence; that he gave first a mortgage, then, endorsed notes, then, other notes, and another mortgage, that he was put to great shifts and inconveniencies to find that security, that he paid one per cent. per month for the money, which paid monthly, amounts to near three times the sum he would have been obliged to pay, had he really administered and had chosen to keep the money in his own hands; that he covenanted expressly to repay the money

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

to Vellio the executor, or to his representatives; that Vellio proved the debt as one due to himself as tutor; that Fouque entered it as such on his bilan; that no facility whatever in the transaction was given to him on account of the assumed quality of tutor in the instrument, but on the contrary every possible precaution taken to secure the debt and to increase the interest that would have been taken from an utter stranger, and surely we shall have a case as distinct from one of an administration as it is possible (for my mind at least) to conceive. If Fouque under pretence of being tutor and calling himself so, had obtained the money, it would have been an act of administration and made him liable as such, but when so many circumstances as those I have enumerated concur to show that the name of tutor, gave him no facilities beyond those a common borrower would have had, the idea of administration must be discarded, and the introduction of the words " as tutor, &c." in the instrument must be ascribed to mistake, and considered as mere surplusage, more especially when we find that in the original loan, no such title is assumed, and by the testimony of Michel and of Fouque, this

East'n District.
March, 1823.

BERNARD&AL.
vs.
VIGNAUD.

appears a continuation of the same business, the changing of the securities being the only alteration.

If this loan was not an administration there is no other act that he has done but being present at the inventory. I have shown that it was not such an act, because the property was then in Vellio's hands, had been put there by direction of the will, and by the same will was to remain under his sole direction, he was *tenedor de bienes*, and the inventory was taken merely to state the amount, not of the tutor's inventory, but the executor's. This was no more an act of administration on the part of Fouque of the minor's estate, than it would have been of mine, had I employed him to make a catalogue of my books, which I intended to lend, or give to another. But suppose this to be such an act, what are the consequences of it? If any loss has resulted from his interference make him responsible for the amount of such loss. But surely! surely! if not the slightest inconvenience has resulted from that act, it would not be quite consonant to equity to give it as the reason for changing the nature of a subsequent transaction, which without it would have been an ordinary loan,

transforming it into an act of administration, and charging it as a tacit lien on his estate, to the utter ruin of an innocent purchaser.

BERNARD&AL.
*vs.*
VIGNAUD,

III. Another point in which I flatter myself with convincing the court that there is error in the judgment, is the effect which the judgment against Fouque ought to have on the decision of this cause.

I can present nothing so forcible or better adapted to truth, and to my cause, than the following reflections of the court, to show that we have a right to examine into the legality of that judgment. "The defendant, (says the court) in the case now under consideration, is an entire stranger to the proceeding against Fouque ; if he cannot question the validity of that judgment, as a means of defence against the seizure and sale of property acquired from the principal debtor, no means of protection would be left for him against the most iniquitous collusion and fraud, which might have been practised between the original creditor and debtor."

Thus we have it established, and indeed it has never been denied, that a judgment against the original debtor is necessary to

BERNARD&AL.
vs.
VIGNAUD.

support this suit, that we have a right to inquire into the validity of that judgment; and, as a consequence, if we find it illegal or unjust, that it can be no foundation for this suit. These principles are clear and they are established by the decision of the court.

A judgment has been produced. Is it valid?

The court have taken a view of it, which has led them to believe that it is. But I trust fully that further consideration will induce them to alter that opinion. If the syndics were necessary parties to the suit, then it seems conceded, that the judgment against Fouque alone was erroneous. I will first examine this objection before I proceed to the consideration of the others. I contend that Fouque was not liable to the suit of the plaintiffs—he had made a cession, the consequences of which were by express law an exemption from any suit, except in two cases: first, for fraud by our statute—secondly, for the surrender of other property he might subsequently acquire, *Part.* 5, 15, 3. *Civ. Code, act of* 1817, *1st sect.* The court say that because he may be sued in these cases, " he is not absolutely privileged against suits on account of debts which ex-

East'n District.
*March*, 1823.
BERNARD&AL.
*vs*
VIGNUAD.

isted previous to the cession of his estate; and that, if there be such cases, we can imagine none more just and proper than a suit, the object of which is merely a liquidation of the debt due by the insolvent, in order to pursue third persons, &c."

Now it is respectfully suggested that this is not the legal conclusion; if the law exempts from suits except in two cases, it appears that, however equitable it may seem, the court cannot add a third; it may be just and proper to allow such suit, but as it does not come within either of the exceptions, it is barred by the general rule, which is as express as words can make it; the law of *Partidas*, above referred to, says of the cession: "*tal fuerza hay, que despues, nose pueden ser el deudor emplazado ; ni es tenudo de responder, fueras ende, si ouviesse tan gran ganancia. que podria pagar los deudos todos, o parte de ellos.*"

The only cases in which a suit is allowed after a cession then, are one, which may be brought to recover property afterwards acquired; another alledging fraud under our statute. The suit against Fouque was neither; therefore the suit against Fouque, was not authorised by law; and of course was invalid

and can be made the foundation for no subsequent proceeding. The case cited by the court, *Fitzgerald* vs. *Phillips*, 5 *Martin*, 588, as sanctioning the doctrine, that a suit may be brought against an insolvent in other cases, will be found on further examination, to show clearly, that such a suit can only be brought on a suggestion that the party has acquired other property. The same case was further considered, 4 *Martin*, 294, when the court expressly say, " Finally, in this case, the right of the creditor to sue being created by the change which happens in the debtor's situation, he should alledge and prove it. In this case, therefore, if the want of that allegation had not been cured by the answer of the defendant, we would have dismissed the action when it first came up before the court." In effect, I pray the court to re-consider that part of their opinion which " considers a suit (against the insolvent) for the liquidation of the debt due by him in order to pursue third persons who may be responsible for such debts, either as third possessors or sureties, as the most proper and just that can be imagined." I pray them to consider whether, to use their own strong and expressive language,

it does not leave the third possessor " without
protection against the most iniquitous collu-
sion and fraud which might be practised be-
tween the original creditor and debtor." Let
it be considered, that in such case, the ori-
ginal debtor has no interest whatever in the
defence of the suit—it is not brought (by the
very case assumed by the court) to make
him liable, but another; he will, (to say the
least,) be careless, and may, without risque of
detection, be corrupt in the defence; he may
suppress proofs of payment in his possession;
or he may not exact the necessary proofs on
the part of the plaintiff; (such as the pro-
duction of the note in the present instance) of
what avail, then, would a judgment against
such a party be, in order to charge an inno-
cent third possessor with a debt? Surely,
this worse than useless formality, this dan-
gerous proceeding, could never be permitted
much less required by the law; and most
surely, when the law in terms forbids it, the
court cannot take upon itself to introduce it,
under suggestion that is equitable or just.

But if not against the insolvent, against
whom must the judgment required by law be
obtained? I answer, that if such action can

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

be brought at all, it must be against the syndics. They alone, can represent the insolvent as to all transactions prior to the cession: they have all his papers—they are supposed to have knowledge of his affairs, sufficient to conduct his defence. The court seem also to be of this opinion but for a mistake in point of fact on the evidence in the cause, and a consequent error in the law is applied to it. The court think, that by the evidence in this cause, the syndics had completely performed their trust, in the year 1813, when they made a distribution; and that in all cases the law is, that the office of syndic ceases, as soon as distribution shall be made.

The office of syndic is a trust, which embraces all the pecuniary affairs of the insolvent. If before distribution, the defence of such a suit as the one in question, formed a part of this trust, (and it is conceded by the judgment that it did) it must form a part of it after such distribution; because, the office is to continue until every part of the trust is fulfilled. It would be different, indeed, as to the syndics personally, if the distribution was accompanied by a formal discharge from the

trust. But in that case, though the person might change, the trust would still continue, and would not revert to the insolvent; but whoever found it necessary to bring any suit, in which his estate ought to be represented, would be obliged to proceed to the nomination of new syndics; and this has frequently been done in practice here. As to all transactions prior to the cession, the insolvent is completely defunct, and his syndics represent his estate as completely, as the heir does that of the ancestor in this country; or as the executor does his testator in countries, where the execution is not limited in duration as it is here.

Let us suppose the case of syndics appointed twenty years since, who have made the distribution of all the monies, that in that time they have been able to collect; and that at this day one of the creditors should discover real property belonging to the estate not claimed by any adverse possessor, but unsold; or a debt that might now be recoverable, though formerly supposed desperate, would not the syndics, (always supposing they had obtained no formal discharge from their trust,) would they not, although they may have made

a former distribution, be allowed to sell the property; to recover the debt; and make another distribution of the proceeds ? If they would, then certainly it shows, that the office has not expired : and if not, they are as liable to be sued as they are capable of sueing. But suppose that the distribution operates as a discharge, and that they cannot sue for, or distribute the same; it will not be denied, that the creditors may appoint others who may; and that too, without calling on the insolvent for a new cession. This shows, that the trust is not ended, even when the persons who were appointed to execute it are incapacitated from performing the duties; and if the trust exists for one object, it must for all: and the same means in case of discharge, may be resorted to by the party whose interest it is to bring a suit against the estate, as may be pursued, in order to enable a suit to be brought. If, then, the distribution operates as a discharge of the old syndics, the plaintiff ought to have caused the estate to be represented by new ones; if it did not so operate, the old ones ought to have been made a party. But the distribution does in no case operate itself as a discharge. The syndics may,

East'n District.
*March,* 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

in case they think nothing further is required to be done, demand such discharge, and the court may in proper cases grant it; but here the syndics did no more than declare a dividend of the money in their hands, which all syndics by our statute are obliged to do, whenever they have funds; (*Sec.* 33, 34, 35, of the laws of 1817) and which, from the very nature of their trust, they would be obliged to do without any such provision. The money they collect belongs to the creditors, and as owners, they may ask for a distribution as often as a reasonable sum has accumulated in the hands of their trustees: there, then, may be many dividends. Each dividend is a distribution, and until the syndic is formally discharged, the making of a distribution does not put an end to his trust. Thus much on the law of this point. Now, as to the fact. The syndics, it is true, made two dividends, one in the year 1813, and another in the year 1814. But they filed the tableau which the court thinks was the termination of their trust at the time of the first dividend, in 1813; but continued to act, to collect money, to bring suit until 1814, when they made the second dividend, a full year after this supposed ces-

BERNARD&AL.
*vs.*
VIGNAUD.

sation of their functions. The date of the tableau proves when it was made, and the statement of the defendants in their petition, when they received the second dividend. But even then, neither they, nor the defendant, nor this honorable court, nor any one else, thought they were discharged; they hoped to make a third; there was other property, as they thought, belonging to the estate; and several years after the distribution, which the court thinks put an end to their office as syndics, they brought a suit against the defendant to recover the property of these very negroes, which the present plaintiffs have seized as being bound by their secret lien.

The cause was commenced in the parish court by original petition, filed in 1814, by supplementary petition filed in 1818, was tried in 1819, and was removed to this honorable court, where it was finally decided, so late as March 1819; and, consequently, was pending when the second dividend was made, and when the suit was brought against Fouque. During all this time, it never occurred to plaintiff, to defendant, or to the court, that the trust had ceased. Certainly the syndics never elected that it should cease, they still

considered the estate as unsettled, and were suing for the recovery of property they thought a part of it at the very time the Judge dismissed the suit as to them, (on what ground I know not, for he has given no reasons for his judgment,) as they could not be discharged without their consent, this seems conclusive. But it is not all: immediately after that suit was decided, the present plaintiffs began theirs to which they considered it necessary that the syndics should be made parties, the syndics came in and answered, but they did not deny their quality, they still considered themselves as capable of being sued, and though the judge ordered the suit to be discontinued as to them, it was not because he thought they were not syndics, but because he erroneously thought Fouque was the proper defendant.

This fact of their continuance in office, must I presume change the decision of the court, which was founded wholly on the idea of their being discharged. I have said perhaps more than enough on this part, but let me submit this query to the consideration of the court—if Vignaud in the suit brought by the syndics had pleaded that they were no

East'n District. longer such, would his plea, under all the cir-
*March,* 1823. cumstances of the case, have been allowed?

BERNARD&AL.
*vs.*
VIGNAUD.

The first reason then why the judgment produced against Fouque cannot be a foundation, for this suit is made out by the principles laid down by the court, and by the facts in the cause, that at the time the suit was dismissed as to them, they were, if the suit could be supported at all, the necessary parties to it.

The second reason I shall alledge is, that the district court had no jurisdiction of the cause. By the Spanish law as well as by our statute, all suits relative to the estate must be brought in the court having cognizance of the cession, which in this instance was the parish court; we were no parties to the cause, and therefore could not make the objection.

A third is, that the judgment is void on its face, no reasons having been assigned on which it was founded. This judgment was rendered on the 2d June, 1818, and on the 23d February 1822. Four years, one month and twenty-one days after the judgment was rendered, and not until after the second judgment on the re-hearing had been granted in this cause. The plaintiffs' attorney moved to amend the judgment and

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

the court ordered it by enacting these words: " The court being satisfied that the plaintiffs' claim is fully supported by the evidence." This point always escaped the attention of the defendant's counsel. I could not think it possible that such a procedure should have taken place at all, and still less without notice to me, and when I perceived it, it was not until I had compared the record with the minutes that I could be convinced there had not been some mistake in copying the dates.

A fourth is that if any suit can be sustained against the defendant on the tacit mortgage it ought to have been brought by the syndics. The plaintiffs claim as mortgage creditors; now this court has decided in the case of *Lanusse's syndics* 455, that the mortgagee cannot himself sue, but the syndics must sue, recover the amount and distribute it; if there be any difference with respect to tacit mortgages I cannot discover it; there may be cases in which the proceeds of the mortgaged premises would be applicable to higher privileges, costs, funeral charges, &c. Should it be objected that here is a third possessor? I answer that the same circumstance occurred in the case of *Williamson's creditors*, 5 *Martin*,

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

620.   S. Henderson had bought and possess-
ed the house, but it was not held to alter the
general doctrine.

A fifth objection to the judgment against
Fouque, is that it does not appear to have
been rendered on *any evidence whatever* and
particularly that the essential evidence of the
production of Fouque's note was not requir-
ed.   In determining on this argument the
court are of opinion that *the evidence on which*
the judgment against Fouque was pronounced
cannot be *inquired into in the present suit.* Here
again I refer to the doctrine previously laid
down in the judgment the terms and sub-
stance of which I have before had occasion
to quote and to admire.  " That if the defen-
dant cannot *question the validity of that judg-
ment* as a means of defence against the sei-
zure and sale of property acquired from the
principal debtor, *no means of protection would
be left for him,* against *the most iniquitous col-
lusion* and *fraud* which might have been prac-
tised between the original creditor and
debtor."

But how can I question the validity of the
judgment if I am not permitted to inquire into
the evidence on which it was rendered. What

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUB.

means have I to detect collusion, if I am not permitted to show that no defence was made when there was a good one; that the defendant did not require the evidence to be produced, which would have been required by the court, had the objection been made by the defendant. It does not appear a conclusive answer to say that we must presume the court would not have given judgment for the plaintiff, if they had not had sufficient testimony to justify them; if that presumption were sufficient, it would be useless to grant appeals; and we all know that where no defence is made, or where parties appear and make no objection, courts every day admit testimony that would otherwise be rejected, and give judgments, that would not have been given had a proper defence been made. In the present instance Fouque contented himself with pleading his cession, and threw his defence on the syndics. The suit was discontinued as to them, and there was no defence, no one to point out deficiencies in the proof, and the court did not think it their duty to examine into them. What then is meant by allowing me to question the validity of a judgment? It is

only that I may see that it is pronounced in the forms prescribed by law, that there has been a positive citation, answer and judgment; if this be all, it is but a poor privilege; for collusion will take care to clothe itself in the outward legal garb; but to detect it and enable me really, not nominally only, to question the validity of a judgment, I must do that which the court say I am not allowed to do, I must inquire on what evidence it was founded; I must be enabled to show if I can, that the defendant in that suit to which I was no party, has sacrificed my interest to his carelessness, or sold it by his collusion, otherwise the privilege of questioning the validity of the judgment would be illusory and unavailing.

There is no maxim in jurisprudence better established or which has fewer exceptions than this, that no man is bound by a judgment to which he is no party. But if I am not permitted to inquire into and to contest the evidence on which a judgment to which I am no party, but which affects my interest is founded, I am then bound by it and in every such case of course this wise principle of law is disregarded, I am bound by a judgment to which I am neither privy nor party. All

East'n District.
*March*, 1323.

BERNARD&AL.
*vs.*
VIGNAUD.

these incongruities and inconveniencies are remedied by giving the party whose interests are to be affected by a judgment to which he is no party the right as well to contravene its justice as its regularity, in other words to examine whether the evidence given in the cause was sufficient to support the judgment.

If we then have this right the task is easy. No manner of evidence appears to have been introduced, there is indeed a copy of the notarial act annexed to the petition, but whether an authentic copy or not, does not appear. There are, the petition, the answers, a record that the cause was brought to trial, and a judgment, but no witnesses examined, no papers read or produced, and it is not until four years afterwards that the judge refers to any reasons for his judgment. He then indeed says, that he was satisfied that the plaintiffs' claim was supported by the evidence, but that declaration, the court will certainly agree with me, was a mere nullity; let it be remarked that we have a complete copy of the record before the court. If a witness had been examined, his name would have appeared; if a paper had been produced, it would have been on file. What does not appear for

East'n District.
March, 1823.

BERNARD&AL.
vs.
VIGNAUD.

all our purposes is not. We cannot prove a negative, the record is *prima facie;* nay, I should say unless diminution is alledged, conclusive evidence that it contains all the matters relating to the suit. It contains no evidence, not even the will, nor the inventory. The plaintiff relies wholly on the notarial act, and it is even doubtful whether an authentic copy of that act was produced. That act refers to a note which the mortgage was intended to secure, the mortgage was tacked to the petition, but the note certainly was not. The record incontestibly proves this fact. Now in the case of *Cox* vs. *Rabauds syndics,* 4 *Martin* 16, it is positively declared that the mortgage is not enough, the plaintiff must also shew that he is the holder of the notes. The court seem to admit this necessity, for they say "whether the note alluded to was or was not produced on the trial of the suit against Fouque does, not appear. If it was (they add) it remains on file in that action, and has nothing to do with the present suit, if it was not, we must suppose its absence was supplied by other legal testimony." Now we have shown by an inspection of the record that it is not on file, the same record proves

that there was no evidence to supply it; and if I have been successful in showing that we have a right to inquire into the justice of that judgment, it must have something to do with the present suit; for although this suit is brought for a tacit lien, that lien grows only out of the loan, which was evidenced as much by the note, as the mortgage. Suppose Fouque had discharged this debt to Vellio at the time it became due, and taken up his note, can there be a doubt that Fouque, much more his innocent vendee, would be exonerated? Suppose instead of receiving the money from Fouque, he received it from another and transferred the note to him, could it make any difference. If we say no, it leads to this manifest injustice that the heirs recover from us, and the executor receives the same debt from the person to whom he has transferred the note. Besides, the holder of that note is subrogated to all the rights which the nature of the transaction gave him, if it carries with it a tacit mortgage, he will be entitled to avail himself of it, and our property will still be liable, even after we have paid this claim.

The court seem so decided as to my objections to the want of a trial by jury, when it had

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

only been waved by those who were declared to be no parties to the suits, that I will say nothing more on that subject, but close with an objection to the present suit, that I think must be fatal.

There are judicial and conventional mortgages, which are evidenced by written acts; tacit mortgages, which in some instances have no writings to support them.

The law says, *Civ. Code* 62, *art.* 43, that mortgage creditors may cause the property affected to be sold, and that a seizure shall be ordered, by producing a copy of the act of mortgage, a judgment against the principal debtor, and the oath of the creditor, with the additional proviso, *art.* 41, that the titles have been registered in the manner prescribed by law. But in cases where there is no instrument to produce, and of course where there can be no registry, what is to be done. The court think that the provisions of the law are to be dispensed with, and that in such case the judgment and the oath are sufficient, but by what authority? The legislature when they required the production of a title and a registry, knew that there were cases of mortgage in which they could not be produced

East'n District.
*March,* 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

they speak of them in the very section; they had not forgotten them, but they require for the seizure a requisite which cannot be complied with in those cases. The conclusion is palpable, they meant to exclude them from that *off-hand* mode of proceeding. Tacit mortgages, which derive their existence from acts not evidenced by writing, are always subject to doubt and contestation, and it was thought unreasonable to begin by depriving a man of property in his possession, while the claim of the plaintiff rested only on parol proof and on doubtful allegations. Nor is there any necessity to justify an extension of the law in this particular ; the party, without having recourse to this summary mode, which I verily believe it was never intended he should have, is not without remedy; he may proceed in the ordinary way against the third possessor in the manner pointed out by the *C. P. L.* 119, *No.* 2, and other Spanish books of practice. As then this is a special remedy, as the only road to obtain it, is the one pointed out by the legislature and as that road cannot be pursued by a tacit mortgage, as there is no necessity that he should travel it, but on the contrary strong reasons why he

BERNARD&AL.
vs.
VIGNAUD.

should not. Can a court of justice without asuming legislative power permit him to arrive at the same end by a bye path, or dropping the metaphor, give the summary remedy to a party who cannot comply with an express previous condition of obtaining it. I have given the court much trouble in this case, but they will not regret it, if it should lead to the advancement of justice, and they will excuse it in favor of my motive, if it should not.

There are some new arguments in these notes, which if good will not lose their effect because they come late. The truth is that the firm persuasion I have always been in, that the principal point in this case was in my favor, that I have perhaps been too inattentive to its other features.

A testamentary tutor who accepts of the office cannot discharge himself from the responsibilities which the law attaches to tutors, because he has neglected to fulfil formalities, which are created for the protection of the minor.

PORTER J. delivered the opinion of the court. The zeal of the counsel who appears for the defendant has enabled us to turn our attention once more to this case : and the very able argument in which he has examined the opinions heretofore delivered, has put it in our power to test their correctness, and has furnished us with ample means to detect any error into which we may have fallen.

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

Fouque the vendor of the property which is now pursued in the hands of the present defendant, was nominated (jointly with one Vellio) tutor to the plaintiffs by their mother, surviving parent. After her death an inventory of her property was made, at which Fouque's presence and assistance as tutor is stated. This instrument he signed, as he also did one two years after, in which he appears as tutor, and declares himself indebted to Vellio as executor in the sum of $5000 belonging to the minors.

On these facts, this court, after the first argument, said, " we find Fouque's express and tacit acceptance of the tutorship, for he assumes the quality or title of tutor, by subscribing an act in which it is given to him. His assistance as tutor to the inventory must be presumed to have had in view the giving faith and regularity to the inventory to which the law imperatively demands the presence of the tutor."

It is now contended there is error in this opinion. Because the law only gives a mortgage on the property of the tutor, *Civil Code*, 72, 75. or on the property of him who without being tutor takes on himself the administration of

East'n District. the property of the minor. *Civil Code*, 456, *art.*
*March*, 1823.
20.    And it is said the person nominated by
BERNARD&AL. the father was not confirmed by the judge,—
*vs.*
VIGNAUD. did not take an oath, did not furnish security,
therefore he was not tutor, and the first clause
of the law already cited does not apply to
him.    He did not administer the property,
therefore he is not responsible under the se-
cond.

If the first position be found true, we shall
have to lament the great defects of our law,
on a subject in which above all others, it has
displayed the utmost anxiety that its provi-
sions should be complete and operative.    For
it is obvious that if the person who is nominat-
ed tutor, can accept the trust, and afterwards
shelter himself against the responsibilities
which flow from this acceptance, by pleading
a non-compliance with formalities *that it was
his duty to fulfil*, the whole policy of our juris-
prudence in this particular is defeated, and
we are led to the strange and pernicious re-
sult that men can find protection in their own
wrong.

We still continue under the impression we
were after the first argument of the cause,—
that if the person nominated tutor in a will

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

takes that quality in a public instrument connected with the discharge of his duties as tutor, that it is an acknowledgement of his acceptance of the office. This position does not indeed appear to be controverted, but it is strongly urged that acceptance does not make him tutor, and it is supposed to be shown conclusively that he is not, by putting the case of Fouque having brought a suit in which his quality of tutor was denied. In such a case it is said the production of the will and the inventory would not establish his capacity, and if they would not, we must say they do not prove him to be tutor in the instance now before us.

The fallacy of this argument we think consists in not distingushing between those objections which might be made by defendants to the demands of a person calling himself tutor, and those which the law accords to a person who is sued in a character which he has taken on himself. Now it appears to us clear, that if Fouque, instead of being plaintiff as in the case put, was defendant, that the production of the will appointing him tutor, and the public act accepting the trust, would be sufficient to authorise judgment against him in that capacity. The general and well established

BERNARD&AL,
*vs.*
VIGNAUD.

rule on this subject is, that a person who has acted in a particular capacity or who has exercised a public trust, cannot contradict the fact of his appointment, even when sued for the penalties inflicted on those who being legally appointed, neglect certain duties imposed on them. *Peake's Evidence*, 21. By a law of the *Partidas*, tutors are concluded by the inventory they make of minor's property, and are not permitted to show there is error in it. There is the same or more reason for holding they should not be allowed to say they were mistaken in the character they acted in, when they made it. *Par.* 3, *tit.* 18. *l.* 120.

The office of tutor is one not only of great importance to the private interests of those for whom it is created, but also to the public, who are deeply interested in protecting the rights of all, who are not of an age to protect themselves. The law has therefore made an acceptance of the office compulsory, unless the person nominated is one of those who are excused from serving. It was the duty of Fouque, when apprized of his nomination, either to have his objections presented to the judge, against being obliged to accept the charge, or in case no such objections existed, to have

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

and obtained the judge's confirmation before he accepted—*Dig.* 26, 7 & 1 & 5, *no.* 9. The law, which requires it and the oath and security, made for his benefit, but the minors; and he has no more right to claim its protection than he would, in case he contracted with the minor, be permitted to avoid the contract, because, the minor enjoyed that privilege where the formalities of the law had been neglected. He who receives the tutorship, says *Febrero*, without observing all the legal solemnities, incurs the same responsibility as the legal tutor, and his property is subject to the same liens; because, the intruder ought not to be in a better situation than he who follows and obeys the commands of the law.—*Febrero, Juicio de Concurso, lib.* 3, *cap.* 3, § 1, *n.* 53. We are of the same opinion, and conclude, that the mortgage given by law on the property of those who are tutors, attached on that of the vendor of this property in the hands of the present defendant.

But admitting, that on this branch of the inquiry, there should exist some doubt, we believe there cannot be any on the second, and that Fouque by his act comes clearly within the provision of the *Code* which gives

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

a mortgage on the property of those �†▇▇▇▇ termeddle in the administration of a minor's estate. In discussing this question, the counsel has earnestly cautioned ▇▇▇▇ court, against at all taking into view the fact of Fouque being appointed tutor in the will. But why we should not take it into consideration, we have really been unable to perceive. Nor in doing so, do we apprehend any such result as that we are warned against—namely, of declaring that Fouque was tutor because he administered, and he administered because he was tutor. To come to such conclusions, on such reasoning, would not be doing justice to the defendant. But without using the appointment of Fouque, and his acceptance, to involve the appellant in a circle from which he could not escape, we think that in deciding on the evidence before us, whether there was an administration of the minor's property by him or not, that the circumstance of his being appointed tutor in the will, and of his having accepted the office, ought to be considered, in order to enable us to form a correct opinion of the real nature of the act from which that administration is inferred. A man who received a minor's property in the

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

character of a depository, could not be said to administer it. ·But, if it was doubtful whether it came into his hands as a depositary, or not, it was asserted that he got it under a pretence that he had a legal right to control it, and that he retained it in that view, would not the relation in which he stood to the minor be a proper subject of inquiry in order to ascertain the true nature of the act? In a case such as that before us, if two tutors were appointed by the will, and one of them acccepted the trust, and as tutor received the property or monies of the minor, this would be *prima facie* an act of administration in him, though, in a mere stranger, it might amount to nothing more than a borrowing. Whenever the act is equivocal the *quo animo* with which it is done, must be resorted to, and our knowledge of it, is greatly assisted by referring to the character in which the party acted.

· The term *administer*, as used in the law which gives this mortgage, has been defined by the counsel "some act in relation to an estate such as none but the owner, or one authorised by him could legally do." This definition is not complete, inasmuch as the

East'n District.
March, 1823.

BERNARD&AL.
vs.
VIGNAUD.

law may frequently confer an authority after the death of the owner, the asssumption of which, on the part of another, would be clearly an act of administration.   With the addition of words to express this idea we should consider it correct.  It would then be " some act in relation to an estate such as none but the owner, or one authorized by him, or by law, in case of his decease, could legally do."  Examining the act done by Fouque, we find him to come completely within this definition.  He appeared at the making of the inventory, assisted at it, and took on himself the quality of tutor.   Here, certainly, was an act in relation to this property which no person, but one authorised by law, had legally a right to do; for on it mainly depended the rights of the minors.  Had he refrained from meddling with it, a tutor legally appointed would have watched over their interests, and taken measures for the preservation of their property.

Still less equivocal do we conceive the act of drawing from Vellio the money of the minors.  If he had merely borrowed it, as any other stranger would, why did he sign an instrument, acknowledging the receipt of the money, in which it is stated he appeared as

East'n District.
*March*, 1823.

BERNARD&AL.
*vs.*
VIGNAUD.

tutor to the minor children ? His taking it in that capacity implied authority over it, and, in our opinion, was clearly an intermeddling in the administration of the property. Vellio, who was appointed co-tutor, and who was responsible for Fouque, taking security that the money should be re-paid, does not in our opinion, change the nature of the transaction. It is evident the money was given to Fouque as tutor. Had he been tutor, there is not a doubt this would have been an act of administration. If he was not, receiving in that capacity, was an intermeddling.

The other objections made to the recent judgment of the court, we deem unnecessary to notice any further than to say, that they have been all examined, and that after an attentive consideration we do not think they are well founded. We have in the particular notice taken of this application, deviated from the usual practice of the court, and have found a reason for doing so, in the sincerity of the conviction expressed by the appellants' counsel, that there was error in the judgment already rendered. After as much attention as we are able to bestow on any cause, we think the opinion of the court fully supported by

East'n, District.
March, 1323.

BERNARD&AL.
*vs.*
VIGNAUD.

reason and authority. If the case was a doubtful one, we should feel an inclination to come to the conclusions which we have already expressed. The law in all its provisions, manifests an almost parental solicitude for the interest of minors, and it is our duty to see that the formalities which it has created for their protection, should not be used as a means, to sanction the waste and destruction of their property.

The re-hearing is therefore refused.